## STONE ET AL. VS. STILLWELL EX. ET AL.

Where property or money belonging to an intestate in his life time, comes to the hands of his administrator, and he holds it as such at the time of making his final settlement, and yet fails to charge himself with, or account for it; the settlement is fraudulent, according to the principles settled in *Ringgold vs. Stone, et al·* (20 Ark. 526.)

The final settlement of an administrator, when approved and confirmed by the Probate Court, is binding and conclusive upon the distributees until successfully impeached by bill in chancery, for fraud in the settlement: and if the distributees file such bill, it must charge the fraud and state the facts constituting the fraud; and the burthen of proving it as alleged, is upon the complainants when denied by answer.

But the fraud charged being the failing to account for money and property recovered by a decree, which the administrator, in his answer, alleges that he had purchased of the intestate in his lifetime, upon proof by the complainants that the suit was brought by the intestate in his life time, alleging title in himself, that the decree was obtained before his death, in his favor, and that the defendant became his administrator, made himself a party to the decree as such, and as such recovered the fruits of the decree in favor of his intestate—in such case, the *onus probandi* is shifted, and it is incumbent on the defendant to prove the purchase as alleged in his answer.

It is true that the verbal declarations of a party are not the most reliable evidence, and should be received with caution; but in this case the verbal declarations were accompanied by written admissions and other circumstances conducing to prove the purchase as alleged in the answer.

Where depositions are taken upon interragatories, under an order of court, it is sufficient, if, after stating the names of the parties and the court in which the suit is pending, in the caption, that the commission direct the evidence to be taken in the "above mentioned suit:" so, if a copy of the interrogatories accompany the commission and the originals remain on file; so also, if, from the certificate of the officer before whom the depositions were taken, it appears that he meant to certify that the depositions were reduced to writing in his presence, though there be a clerical mistake in the certificate.

*Appeal from Independence Circuit Court in Chancery.*

Hon. WILLIAM C. BEVENS, Circuit Judge.

ROSE, for the appellant.

The original interrogatories were not attached to the commission as required by *sec.* 11, *chap.* 55, *Dig.*, *p.* 437; and the copy attached is one that the clerk had no right to make out, the original not being an office paper; so the copy is a nullity.

Neither did the certificate of the justice of the peace state that the deposition was reduced to writing in his presence, as required by *sec.* 13, *chap.* 55, *Dig.* For this the deposition should, undoubtedly, have been suppressed, as held in *Hammond vs. Freeman*, 4 *Eng.* 62.

The effect of a judgment, or rather decree, of the Probate Court in confirmation of an administrator's settlement has been duly considered by this court in the case of *Ringgold vs. Stone*, in the last volume of our Reports, and on that point nothing need be said.

In the court below, it was insisted for the defense that the entire answer of Fowler is responsive to the bill, and that before the plaintiffs could recover they would have to disprove the answer by two witnesses, or by one with corroborating circumstances.

The office of an answer is well understood; and no where has it been more fully discussed or more satisfactorily settled than by this court in the cases of *Wheat vs. Moss*, 16 *Ark.* 251, *et seq,*; *Roberts vs. Totten*, 13 *Ark.* 613; *Whiting vs. Beebe*, 7 *Eng.* 588; *Biscoe vs. Coulter*, 18 *Ark.* 435, 436.

What this court says, in substance, is this: That an answer in chancery may sometimes perform the double office of pleading and evidence. That wherever an answer is responsive to the charges of the bill, and when it states matters within the knowledge of the defendant, it is evidence, and shall be taken as true. But the answer is never evidence for the defendant when, after confessing the charges in the bill, it goes on to state matters in avoidance, to state what the plaintiff did not call on

the defendant to state, and what the plaintiff did not want him to state.

The bill charges that the defendant, Fowler, received certain property as administrator of Rufus Stone, deceased; the answer admits this to be so, but seeks to avoid the force of this admission by setting up the purchase. This would seem to be a clear case of confession and avoidance. *Lott's Gilb. Ev. (Dublin Ed.* 1795,) 52; 7 *Vesey* 404; *Payne vs. Coles,* 1 *Munf. R.* 395.

Principle and authority combine to overthrow the position taken by appellees. And if the law is in favor of the appellants in this case, on that point, they had nothing to prove; but the whole burden of proof lay on the defendant, Fowler. And if it were admitted that the evidence shows a transfer of the slave and decree to Fowler, it is submitted that there is nowhere a single syllable of testimony going to show that the transaction was *fair*, that the *consideration was' adequate*, and the *purchase equitable.*

Verbal admissions are the weakest kind of evidence ever admitted in courts of justice—they awaken a suspicion rather than convince the mind. When made in casual conversation, too little importance can hardly be given to them. *Prater vs. Frazier*, 6 *Eng*. 249.

Besides, in this case we find a motive in Stone to attribute title to Fowler. The answer shows that the former was in debt; the evidence shows that he was harassed by executions and seeking relief from his financial difficulties.

Moreover, the answer contains intrinsic evidence of the weakness of the defence. It cannot but be considered a strange thing that such a contract should be made, and that the attorney, knowing with what a jealous eye such contracts are looked upon, should have obtained no memorandum in writing of the transaction during Stone's life—and Stone lived long after— and should have no witness to prove the contract. The contract is not even proved to have ever been made. There is nowhere a syllable of proof to sustain the contract made in the

answer. If made, it was between a client and attorney, where the attorney had a complete and most unusual ascendency over the client; and, therefore, the contract should not only have been proved clearly, but it must be shown by the attorney, according to the authorities, that the contract was *perfectly fair, adequate and equitable.*

STILLWELL & WOODRUFF, contra.

When in any case (and particularly in a case like this, where the complainant seeks to set aside a solemn judgment,) the ground relied upon for relief is fraud, the particular act of fraud, misrepresentation or concealment, and the manner of its perpetration must be pointed out. 7 *How. U. S. Rep.* 828; 7 *J. C. R.* 77; *Story's Eq. Pl., sec.* 800; 13 *Ark.* 616; 14 *Ib.* 125; 20 *Ib.* 537. In this case, there is only a general charge that the settlement was fraudulent and untrue—no averment that the negro or his hire was the property of Stone in his life time, or that Fowler made any misrepresentation or concealment.

The defendant averred, and the evidence proved, that, at the time of his death, Stone had not the slightest interest in the subject matter of the decree against Fulsom. The facts set up in defence did not occur after Fowler became administrator, or after the death; consequently they do not go to discharge him from liability admitted or proved, but show that there never was any liability. The answer of Fowler—he being compelled to answer and disclose the whole matter—and every fact stated in explanation must be taken as true, unless overturned by evidence. 16 *Ark.* 252; 13 *Ib.* 123; 18 *Ib.* 591.

The matter never could be re-examined in any other than an appellate court, except upon the specific averment, sworn to, of fraud in the settlement, and having utterly failed to prove any fraud, and all the forms of law having been complied with, notice given and admitted and proved by the record, the the judgment of the Probate Court, confirming the settlement, is conclusive upon the plaintiffs. 14 *Sm. & Mar.* 98; 8 *Ark.* 270; 16 *Ib.* 480; 14 *Ib.* 124.

Mr. Chief Justice ENGLISH delivered the opinion of the court.

This was a bill to impeach the final settlement of Absalom Fowler, as administrator of Rufus Stone, deceased, determined in the Independence Circuit Court.

The complainants were Jefferson Stone, in his own right, and as administrator of his deceased brother Solon, and as guardian of his minor brother Rufus, who were the sons and heirs at law of Rufus Stone, deceased.

The defendants were Fowler and Joseph H. Egner and Morgan Magness, the sureties of Fowler in his administration bond.

The bill was dismissed for want of equity, the complainants appealed, and after the case was brought here, the death of Fowler was suggested, and Joseph Stillwell, his executor, substituted, etc.

The material allegations of the bill are, that Rufus Stone died intestate, 10th March, 1853. On the 26th of the same month Fowler became his administrator; and in April following, filed an inventory, in the Probate Court of Independence county, from which his letters were issued, stating that no assets had come to his hands, and there were none within his certain knowledge, except an old and diseased negro man, not worth the expense of appraising.

That on the 1st of October, 1856, Fowler filed his account current for final settlement, in which he stated that nothing had come into his possession as administrator, except the old and valueless negro referred to in the inventory; and that the estate was indebted to him in the sum of $2 50, expended by him for letters, etc. Which account, after publication, was confirmed by the Probate Court, and Fowler discharged.

That but one demand had been allowed and classed against the estate; and that was in favor of Wm. H. Stone for $200.

That it was not true, as stated in the settlement, that nothing came to the hands of Fowler, as administrator; but, on the contrary, that Rufus Stone, in his life time, commenced a suit against Isaac Folsom, in the Circuit Court of Jackson county, or a negro man named Ben, and for his hire for a number of

years, in which suit, Fowler was the attorney of Stone; and after his death, the cause was revived and prosecuted in the name of Fowler, as his administrator. That on the final termination of the suit, Fowler, as such administrator, obtained a decree against Folsom for the negro, and for $1,675 00 hire; and that he afterwards obtained possession of the slave, and collected the hire, etc., but had failed to account therefor in his settlement. And the bill alleges that in this, the inventory and settlement were false and fraudulent, etc., praying that Fowler and his sureties be compelled to account for and pay over the slave, the money collected on the decree, subsequent hire, etc., after deducting the $2 50, expended by Fowler for letters, etc., and that the same be appropriated first to the payment of the demand allowed in favor of Wm. H. Stone, and the remainder to complainants.

Egner and Magness demurred to the bill, on the grounds that if they were liable at all, the remedy against them was an action at law on the administration bond, and that they could not properly be joined with Fowler in a suit in chancery; but the demurrer was not disposed of until the hearing.

Fowler answered the bill. The answer, in substance, denies, in the most positive and direct terms, that any assets whatever, came to his hands as administrator of Stone, and particularly that the negro Ben, and his hire collected by him under the decree against Folsom, were assets.

On the contrary, he alleges that, at the time Stone employed him to bring suit for Ben (in the year 1848,) he was largely indebted to him for house rent, professional services, small sums of money advanced, balance upon a judgment transferred to him by one Calvert; and that he had control of another judgment against Stone in favor of one Stewart, etc., etc., the particulars of which are stated, and an account thereof exhibited. That Stone employed him upon an express agreement, that he was to have a fee of $500 for prosecuting the suit to its final termination, and was to take and appropriate Ben and his hire, if recovered, first to the payment of the fee, then to the liquidation of his other de-

29

mands against Stone, and the balance, if any, to apply as a credit upon the Stewart judgment; and that under this agreement, he brought and prosecuted the suit, in the name of Stone, but for his own benefit.

That he obtained a final decree against Folsom, in the Jackson Circuit Court, 21st November, 1851, for Ben and his hire; after which, and as of that date, he had a settlement with Stone, in which it was agreed that Stone's entire indebtedness to him, including the fee of $500, was $2,510, and he was to credit Stone with $1,100 for Ben, that being the value fixed upon him by the decree, and $1,675, the amount of hire recovered, making an aggregate of $2,775, which extinguished Stone's indebtedness to him, and left a balance in Stone's favor of $265, which was to be applied as a credit, upon the Stewart judgment, as originally agreed upon between them before the suit was commenced. That he was to take the decree and its fruits absolutely, and at his own risk—the risk of getting possession of Ben, and of the solvency of Folsom.

That there was pending between them at the time, however, a negotiation about an exchange of some lands, and it was understood that if it was perfected, the settlement was to be recast, but the exchange was never consummated.

That Stone died in November, 1852, (and not in March, 1853, as alleged in the bill,) and Folsom having appealed from the decree to the Supreme Court, Fowler, for the purpose of availing himself of the fruits of the decree, became his administrator, prosecuted the case in the Supreme Court, the decree was affirmed, and he afterwards obtained possession of the negro, Ben, and collected the hire decreed, nominally as administrator of Stone, but for his own benefit, and that they were not recovered as assets, etc.

He denies that there was any fraud in his inventory or settlement, and pleads the judgment of the Probate Court in bar, etc.

It is insisted by the executor of Fowler that the allegations of fraud are general, and not specific, and that the bill is, there-

fore, fatally defective. But this is a misapprehension of the character of the allegations. The bill has the merit of being short and pointed, and is therefore creditable to the counsel who drafted it; but the facts upon which the charge of fraud in the settlement is based, are distinctly and specifically stated. It is alleged that the negro Ben, and his hire, recovered in the suit against Folsom, were the effects of Stone, and came into the hands of Fowler as assets, and that in making his final settlement, he failed to charge himself with either, falsely stating that nothing had come into his possession : and in this, the fraud is alleged to have consisted. If Ben and the decree for his hire belonged to Stone at the time of his death, they constituted, it seems, his entire estate ; and if Fowler recovered them as his administrator, and held them as such at the time he made his final settlement, and yet failed to charge himself with them, or account for them, the settlement was fraudulent, according to the principles settled in *Ringgold vs. Stone et al.*, 20 *Ark.* 526.

There is one feature of the case favorable to Fowler, which the bill fails to notice :

It appears, as alleged in the answer and proven, that shortly after the death of Stone, he addressed a letter to his oldest son, Solon, informing him that he had purchased the decree against Folsom, of his father, in his lifetime, how he had paid for it, and that an administration was necessary to enable him to prosecute the suit, on the appeal of Folsom, in the Supreme Court, to obtain the benefit of the decree ; and requesting him, or his mother, to take out letters ; and stating that if they declined, he would do so himself. He also caused a written notice to be served on Folsom, informing him that he had purchased the decree, etc. ; and when he filed his account, in the Probate Court, for final settlement, several years after he had administered, he stated, in a note at the foot of the account, that he had purchased the decree for Ben, and his hire, of Stone, during his lifetime, and fully paid him therefor, and that the proceeds thereof, were his own private property ; and that his name, as

administrator, was used in enforcing the decree as a matter of form only.

Thus it appears that Fowler's claim to the decree was made known to the family of his intestate shortly after his death, to the probate court, and to any person who thought proper to look into the matter, when he filed his account in the clerk's office for settlement; and the attention of the public was invited to it by the advertisement required by the statute. If there was any concealment, or imposition upon the probate court, it certainly did not consist in any failure of Fowler to inform the court, or to make public the fact that there was such a decree, and that he had availed himself of its fruits.

The counsel have discussed, at length, the effect to be given to the answer of Fowler: for the appellants, it is insisted that so much of the answer as sets up Fowler's purchase of the fruits of the suit against Folsom, is not responsive to the allegations of the bill, but new affirmative matter, to be proven by him; while the appellee contends that it is responsive, and must be taken as true, unless it. is disproven by the testimony of two witnesses, or of one, with strong corroborating circumstances.

The counsel for appellants cites, as in point, the case of *Beckwith vs. Butler*, 1 *Washington's Va. Rep.* 224, in which the President of the court said :

" The answer of a defendant, in chancery, is not evidence, where it asserts a right affirmatively, in opposition to the plaintiff's demand. In such case, he is as much bound to establish it by different testimony, as the plaintiff is to sustain his bill. The appellant, who is the heir at law, and executor of his father, swears in his answer, that the father, in his lifetime, gave him Tayloe's bond, the amount of which forms the great bulk of the personal estate sought to be distributed. It would be monstrous, indeed, if an executor, when called upon to account, were permitted to swear himself into a title of his testator's estate."

That was a bill praying for a distribution of the personal estate of Sir Marmaduke Beckwith, and to set aside a deed

OF THE STATE OF ARKANSAS.        453

Term, 1861.]        Stone et al. vs. Stillwell ex. et al.

made by him to his son, Jonathan, for fourteen slaves, upon a suggestion of fraud in the obtaining of it, and for a division of them amongst the representatives. His son, who was executor, in his answer, denied the alleged fraud in obtaining a deed, etc., and stated that there was little other estate, except a debt due from Col. Tayloe, which his father gave him, in his lifetime, as a compensation for his having consented to the sale of a large English estate, which would have descended to him.

The allegation in the answer, respecting the gift of Tayloe's bond, was not supported by testimony; and, upon that feature of the case the President of the Court made the remarks above copied.

That case, it may be remarked, is distinguishable from the one now before us, in this: That was simply a bill against an executor for distribution of the personal estate of his testator; and in his answer he stated that his father had given him part of the estate during his life, etc. The allegation of the gift was clearly affirmative matter, as held by the court.

In this case, Fowler's final settlement account had been approved and confirmed by the solemn judgment of a court of competent jurisdiction, which is binding and conclusive upon the distributees until successfully impeached by bill in chancery for fraud in the settlement. Such is the provision of the statute. *G. Dig.*, *chap.* 4, *sec.* 129. The appellants were required to charge the fraud in their bill, and to state the facts constituting the fraud; and the burthen of proving the fraud, as alleged, was upon them, when denied by the answer.

We think, however, without undertaking to determine the precise effect to be given to so much of the answer of Fowler as sets up his purchase of the fruits of the suit against Folsom, that when the appellants made it appear that the suit for Ben and his hire was brought in the name of Stone, during his lifetime, alleging his title to the negro: that a decree was obtained before his death, in his favor; that Fowler became his administrator, made himself a party to the decree as such, and as such recovered the negro, and hire, decreed to his intes-

tate, the *onus probandi* was shifted, and it was incumbent on him to prove that he purchased of Stone the fruits of the decree, in his lifetime, as alleged in his answer.

Declarations of Stone, to several witnesses, and expressions in his letters to Fowler, proven and read upon the hearing of the cause, tend strongly to establish the truth of the answer.

RICHARD SEARCY testified, that some time in the year 1851, or 1852, after the suit against Folsom had been decided in the Jackson Circuit Court, Stone employed James Cason and Thomas Collard, to go to Walnut Camp, in Poinsett county, to get the negro Ben, in controversy in the suit. Witness assisted him in employing the young men, and Stone told him that he wanted the negro boy for Col. Fowler, and intended to send him over to the Colonel as soon as he got him.

JESSE SEARCY testified, that after the rendering of the decree, in the Jackson Circuit Court, in the suit between Stone and Folsom, Stone called upon him, in the presence of Fowler, to witness the fact that he had sold to Fowler the negro, Ben, referred to in the decree, stating at the same time, that the boy was to go as part payment of his indebtedness to Fowler. Witness heard him say frequently, both before and after this, that he was indebted to Fowler. He also heard him say, on several occasions, that he wished Fowler to have the full benefit of the whole decree—that he wished him to have all the proceeds of it, as in payment, or part payment of his indebtedness to him.

W. W. TUNSTALL testified that during the lifetime of Stone, he had conversations with him about the suit between him and Folsom, and the decree he had recovered against him, in the Jackson Circuit Court, for the negro, Ben, and his hire; in which conversations Stone told witness he had given up the decree and suit to Fowler. That he owed him, and had given the decree up to him, or the control of the decree.

Fowler resided at Little Rock, and Stone at Batesville.

The final decree against Folsom, in the Jackson Circuit Court, was not rendered until 21st November, 1851, but an interlocutory decree was made 24th May, 1851, establishing Stone's

right to the negro, Ben, and awarding him process to obtain possion of the boy, and David W. Lowe, of Independence county, was appointed a special master to take and report an account of hire, etc.

In a letter from Stone to Fowler, dated Batesville, October 11th, 1851, after referring to the taking of depositions before the master, and complaining of Lowe's tardiness, etc., he says: "As soon as Judge Lowe makes the decision, I will go and get the boy, Ben, and then fetch, or send him to you. If you should need money so badly that it will not suit to keep him until you can test his qualities, you had better sell him for what he will fetch. He is young, stout, and likely, and will sell for a fair price, independent of his mechanical qualifications," etc.

In another letter of Stone to Fowler, dated Batesville, 29th November, 1851, he says: "Ben has not as yet come in, but I am told he will soon be given up, and I think there is but little doubt of it. And I will send him to you the first opportunity."

It is true, as insisted by the counsel for appellants, that the verbal declarations of a party, are, by no means, the most reliable evidence, and should be received with caution, and the importance to be attached to them depends much upon the circumstances under which the declarations are made, and the accuracy of the memory of witnesses, who undertake to repeat them. But the written admissions of a party are entitled to more weight.

The importance to be attached to the declarations and admissions of Stone, as tending to maintain the truth of the material allegations of the answer, is enhanced by the testimony of a number of witnesses, conducing to prove that he was largely indebted to Fowler, as alleged by him.

It was fully proven, by attorneys, that Fowler rendered the professional services, for Stone, referred to in the account exhibited with the answer, and that the charges made therefor were usual and reasonable. He was the attorney of Stone for many years, and attended to quite a number of cases for him in the courts. He also paid costs for him in several cases.

**456** CASES IN THE SUPREME COURT

Stone et al. vs. Stillwell ex. et al. [December]

It was also proven that Stone occupied a dwelling house belonging to Fowler, in Batesville, for six or eight years, the rent of which was worth from $150 to $200 per annum; and that $125 a year, the amount charged by Fowler, was low rent.

There was some evidence tending to show that there was a balance due upon the judgment of Calvert against Stone, and that by an arrangement between the parties, it was to be paid to Fowler, as alleged in his answer.

It was also made to appear that Fowler was the attorney of Stewart, in a suit in which he obtained the judgment against Stone, referred to in the answer.

Such proof of the indebtedness of Stone to Fowler, tends to strengthen the importance to be attached to the declarations and admissions of Stone, which conduce to prove that he made a transfer of Ben and his hire to Fowler, in payment of his indebtedness, as alleged in the answer.

There was one act of Stone—the execution by him of a power of attorney to Watson, December 11th, 1851, authorizing him to collect the decree against Folsom, and appropriate the proceeds thereof in payment of debts recited to be due to himself and others—which is inconsistent with all of his other declarations and admissions proven upon the hearing, and unless it may be accounted for on the supposition that the power of attorney was executed pending the negotiation between him and Fowler for an exchange of lands, and in view of some expected modification of the terms of their agreement, in relation to the proceeds of the decree, it must be concluded that, for the time being, he faltered in his determination to adhere, in good faith, to his agreement with Fowler.

Nor, have we overlooked an expression in a letter to Fowler to Stone, of 4th December, 1851, in relation to the exchange of lands, which appears to militate against the truth of that portion of his answer, in which he is understood to state that he and Stone had, in the preceding month of November, come to a settlement and agreement in regard to the amount of Stone's

OF THE STATE OF ARKANSAS. **457**

TERM, 1861.]                Stone et al. vs. Stillwell ex. et al.

indebtedness to him, etc. But an instance rarely occurs, in a contested case, in which the court is able to reconcile the entire pleadings and evidence with the conclusion reached. Minor inconsistencies must yield to the general tendency of the proof to establish a particular hypothesis, and the decision must rest with the preponderance of the evidence.

Our conclusion is, that the weight of evidence is decidedly in favor of the truth of the material allegations of the answer.

We have examined the grounds on which the appellants moved to suppress the deposition of Tunstall, and concluded that they were unsubstantial, and that the court below was not in error in overruling the motion to suppress.

The 1st objection is, that the commission was not entitled of any suit, etc.

The deposition was taken upon interrogatories, under an order of the court. It appears from the transcript before us, that, in issuing the commission, the clerk first stated the names of the parties, and the court in which the suit was pending, in the caption; then copied the order of court: and then followed the commission, in which the officer, to whom it was directed, was required to examine Tunstall as a witness "*in the above-mentioned suit,*" upon the annexed interrogatories.

The 2d objection is that a copy of the interrogatories was annexed to the commission, and not the originals.

Fowler applied to the court for an order to take the depositions of Tunstall and Waring, upon interrogatories to be propounded to both witnesses. The record states that the counsel of the opposing parties examined the interrogatories, made no objections to them, and filed no cross interrogatories, whereupon the court made an order for a commission to issue to take the deposition of each of the witnesses, and that a copy of the interrogatories be annexed to each commission.

If the statute (*Dig. ch.* 55, *sec.* 11,) contemplates that the original interrogatories should be annexed to the commission, or if such be the practice, we do not see how the appellants could possibly have been prejudiced by the clerk's permitting the origi-

nals to remain on file, and annexing a copy to the commission, as directed by the order of court. There is no pretence that the copy was imperfect, or differed in any respect from the original interrogatories examined and acquiesced in by the counsel for the appellants.

The 3d objection is, that the certificate of the justice of the peace, before whom the deposition was taken, does not state that it was reduced to writing in his presence, as required by the statute.

The justice states in his certificate, "That the examination, responses and statements of said deponent was reduced to writing in *my*, and by the said deponent sworn to and subscribed in my presence, at the time and place aforesaid," etc.

It is manifest that the want of the word "*presence*," after the word "*my*," where it first occurs in the certificate, was a mere clerical omission by the justice; and taking the whole certificate together, it is evident that he meant to certify that the deposition was reduced to writing in his presence.

The question in regard to the reading of letters of Stone, etc., in evidence upon the hearing, which were not made exhibits to the answer, but proven by depositions taken upon notice, was decided in *Trapnall adx. vs. Byrd's ad.*, 22 *Ark.*, 10.

To recur again to the merits of the cause, we have found nothing in the record to make the impression that Fowler, in making the agreement with Stone to transfer to him the fruits of the suit against Folsom, for Ben and his hire, abused the confidential relation existing between them as attorney and client, or that the agreement was unreasonable or unfair, considering the indebtedness of Stone to Fowler, and the services to be performed by him in that suit.

The decree of the court below, dismissing the bill, must be affirmed.

Mr. Justice FAIRCHILD did not sit in this case.